Arthur J. Abrams J.
This is a proceeding under article 10 of the Family Court Act in which the respondent, Jeanne Baum, is charged by Robert E. Bay, attendance supervisor of Middle Country School District No. 11, Suffolk County, New York, with neglecting her 13-year-old daughter, Elizabeth (Siba) Baum, in failing to send her to public school. The petition alleges that respondent, "has without just cause or valid reason, withheld said child from attendance at the Selden Junior High School in the following days of the current school year: September 3, 4, 5, 8, 9, 10, 11, 12, 16, 17, 18, 19, 22, 1975”.
At the time of the arraignment or plea, the attorneys for the respondent and the infant, Siba, specifically requested the courtroom be opened during the trial to spectators and the press over the objection of the County Attorney; the request for an open courtroom was granted.
On or about October 20, 1975, respondent moved to dismiss the petition on the ground that respondent had a valid reason for withholding her child from the school system; namely, because following (alleged) racist written and oral remarks by one of Siba’s teachers, to wit: Ms. Carol Duarte, no reasonable effort was made by the school system, either to recognize the racist nature of the remarks in question, or to take steps to prevent a repetition thereof. Although the court refused to dismiss the petition, we did grant respondent’s request for alternative relief; namely, "a meeting between all interested persons * * * so that a swift, remedial result can be obtained”. Such a meeting was held on November 29, 1975, but proved fruitless.
It is not disputed that Siba has, in fact, been withheld by respondent from attendance at the school; however, were this the matter in dispute, the fact of her absence has been clearly established by a preponderance of the evidence.
Siba is a bright, 13-year-old girl who was attending Selden Junior High School in June of 1975. On June 9, 1975, Carol Duarte, Siba’s English teacher, returned a book report to Siba *411 that had been written by the child -in December of 1974. The report dealt with the autobiography of Gerónimo, edited by one S. M. Barrett. In her report, Siba was very critical of the treatment afforded Indians (native Americans) by white people and what she considered the book’s unfair and inaccurate portrayal of Gerónimo and other Indians (native Americans). A handwritten comment by Ms. Duarte at the bottom of Siba’s paper stated as follows: "I agree with your feelings of anger. However, I have an uncle who is a Wamponoag Indian and his point of view is that the Indians got what they deserved.” Siba was very much affected by this remark and approached Ms. Duarte in class. Despite Ms. Duarte’s request that the matter be discussed privately or after class, a verbal exchange took place between teacher and pupil. Ms. Duarte attempted to explain the reasons for her written comments, causing a further colloquy between the two.
Siba returned home and related to her mother what had occurred in her English class.
The following morning at 8:00 a.m. Mrs. Baum, accompanied by her daughters Brenda and Siba, appeared at the Selden Junior High School. A conversation was had between Messrs. Lacina and Lupetin, the principal and assistant principal, respectively, Ms. Duarte and the Baums, which conversation was tape recorded by the respondent. As the meeting unfolded, Ms. Duarte again attempted to explain the reasoning for her statements to Siba, apologized to the child and mother for causing Siba’s upset and agreed to apologize to Siba’s English class. Respondent apparently was not satisfied with the progress of the meeting and announced that she was taking Siba out of school. Then she relented and agreed to have her daughter take her final examinations some place other than Ms. Duarte’s room. Siba took her finals and shortly thereafter was promoted to the eighth grade.
After the morning meeting of June 10, 1975, Ms. Duarte apologized to her class, an apology regarded by the respondent as "half-hearted”, more about this later. On June 11, 1975, respondent withdrew Siba from school. Mrs. Baum contacted the Human Rights Commission, transcribed the tape of her meeting with the school authorities and sent copies of the said transcription, together with a chronological report and notes to, among others, the Human Rights Commission, the school principal, all members of the school board, the Parent-Teachers Association and the teachers’ union.
*412 After the June 10, 1975 meeting, two more meetings took place during the summer of 1975 between the respondent, school officials and representatives from the Human Rights Commission. At these meetings, a series of demands were set forth by the respondent as conditions precedent for Siba’s return to school. Respondent’s proposals, as she testified, are as follows: a policy statement be issued by the school district stating that racism in any of its forms would not be tolerated in the district and that if racism is indorsed or neglected, it is tantamount to indorsing or condoning it, that a steering committee was to be set up within the school itself with the Human Rights Commission and a possible member from the committee to sit in and determine needs of all kinds in regard to preventing situations such as that which involved Siba, that Ms. Duarte’s remarks made in the classroom and at the June 10th meeting be declared as racism and that through the existing union management machinery of the school that Ms. Duarte be brought up on charges of nonprofessional conduct. Mrs. Baum concluded, "My demands, as I say, I’m almost sorry that they are called demands. They are no more than an administrator would have done on their own. I’m not asking for anything out of the ordinary.” By the opening of school in September, the matter was still unresolved and the respondent continued to withhold Siba from school.
Thereafter on September 16, 1975, respondent wrote a letter to Ewald Nyquist, New York State Commissioner of Education, in which she complained of the refusal by the school district to recognize racist attitudes and that she intended to keep her daughter out of school until some possible corrective action was taken. Mrs. Baum’s letter was answered by Stanley C. Campbell, Division Administrator, Division of Intercultural Relations in Education, of the State Education Department in which he urged respondent to return her child to school, discounted Mrs. Baum’s contention that the school district had not taken any action and offered to have a member of his staff visit the district in an effort to resolve the matter and develop improved multi-cultural programs. Respondent still refused to return Siba to school, whereupon the present proceeding was commenced. Subdivision (f) of section 1012 of the Family Court Act defines a neglected child as follows: "’Neglected child’ means a child less than eighteen years of age (i) whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the *413 failure of his parent or other person legally responsible for his care to exercise a minimum degree of care (A) in supplying the child with adequate food, clothing, shelter or education in accordance with the provisions of part one of article sixty-five of the education law”. The applicable portions of the article 65 of the Education Law are as follows: Section 3205 "In each school district of the state, each minor from six to sixteen years of age shall attend upon full time instruction.” Section 3204. "1. Place of instruction. A minor required to attend upon instruction by the provisions of part one of this article may attend at a public school or elsewhere.”
From the testimony taken, it does not appear that Siba has been receiving instruction elsewhere, thus, respondent has not met the burden of showing compliance with subdivision 1 of section 3204 of the Education Law (Matter of Myers, 203 Misc 549).
The issue then is whether respondent had or has justification in refusing to allow her child to attend school. In Matter of Oliver v Donovan (32 AD2d 1036, 1037) it has been held that "parents do not enjoy a general power of supervision over school authorities. Complaints pertaining solely to matters within the administrative expertise of the educational officials involved are not judicially cognizable. Proper avenues of appeal are available and the parent is constrained to employ them (cf. Education Law, § 310).” However, where a child is being exposed to a condition which threatens his health, safety or welfare, a different situation prevails (Matter of Donohue v Cornelius, 17 NY2d 390); but the court cannot conclude from any of the evidence at the trial that such a situation exists in Middle Country School District No. 11.
During the course of the trial there was much testimony elicited in regard to the native American heritage of respondent and her daughter, Siba. While the court does not believe that the degree of consanguinity of native American blood in the respondent or her child is particularly germane to the issues which have been presented herein, it was established during the course of the hearing that Siba’s maternal great, great grandfather had some native American heritage.
Rather than proceed as she did, Mrs. Baum had other alternatives available to her; she could, inter alia, have filed a formal complaint with the New York State Department of Education. This course she did not entertain, but merely sent them the letter she alluded to previously. The court could *414 simply rule that the respondent has failed to exhaust her administrative remedies; however, we found the facts herein to be of a sufficient nature to justify discussion of the proffered, alleged defense. The defense is racism and is by way of an affirmative defense and, thus, must be established by a fair preponderance of the evidence. To our mind, this has not been done.
Siba’s report on Gerónimo and Ms. Duarte’s comments thereon were the focal point of much of the testimony elicited during the trial and when all is given due weight, we must ask ourselves what, if anything, was established? The teacher’s reference to her uncle’s observations about Indians (native Americans) can be interpreted as a learning device, the role of "devil’s advocate”, to stimulate a student’s thinking as readily as anything more onerous. Siba’s appearance on the witness stand, coupled with a reading of her compositions conveyed a picture of an intelligent, strongly opinionated and embittered child, prone to thinking in "absolutes”. The June 9th afternoon confrontation between teacher and pupil was an emotional one and resulted in language which could have been better phrased or better thought out, particularly in the context of how it might be interpreted by one possessed of Siba’s strong convictions.
With this then as the background or history, what did the respondent mother do? She stated that upon her daughter’s return home from school, she (Mrs. Baum) telephoned the parents of two of Siba’s classmates to ascertain what transpired between teacher and pupil (we might note that although available, no witness to the classroom discussion was called to testify). Understandably, a concerned parent would have been most anxious to confront the school authorities at the earliest moment, and we do not suggest that Mrs. Baum was not concerned; however, what is not understandable was the use of a tape recorder.
From a hearing of the tape, certain things appear clear— the teacher apologized to Mrs. Baum and her daughter and said she would (and did) apologize before the class, Mrs. Baum was seemingly dissatisfied with what was transpiring at the meeting, though was most reticent about her desires, save for the fact that Siba was to be removed from Ms. Duarte’s class and the school officials were conciliatory though uncertain in what direction to traverse. At the further meetings held in late June and July, Mrs. Baum presented her "demands”; she *415 described them as not being out of the ordinary; we do not at all concur. We believe the demands led the school district into a cautious approach towards resolving the controversy, thus, negating the efforts of the Human Rights Commission. We note Mrs. Baum’s characterization of the teacher’s apology to the class as being a "half hearted” one, yet she again failed to have anyone who heard the apology testify. Her self-help has, in our opinion, resulted in the retardation of the child’s educational progress and is, thus, tragic.
The court recollects the testimony of the respondent’s experts on racism and is not unaware of the horrendous effect this phenomenon can have on both those who entertain it as well as those who are subjected to it. To our knowledge, this is the first time such a defense has been raised in an educational neglect proceeding and if the defense had been established, perhaps a precedent may have been set. However, the facts herein do not justify such a finding. The teacher’s racism, whether overt or covert, has not been established by the testimony elicited herein. Therefore, there cannot be condonation of that which did not occur.
We indicated earlier that we thought the school district was negotiating in a most cautious manner. We felt that they had taken this posture in light of Mrs. Baum’s position. With the writing of this memorandum decision, it is our hope that perhaps some good may be engendered from all that has taken place. An educated community is an enlightened one. Thus, the development of a meaningful multi-cultural program, including that of the native American, might well be a matter of priority to the Middle Country School District No. 11.
To conclude, the court finds that the allegations of the neglect petition have been established in that respondent has without just cause or valid reason withheld her child from attendance at the Selden Junior High School on the days set forth in the petition herein.
This matter is set down for a dispositional hearing pursuant to article 10 of the Family Court Act at 10:30 a.m. on Friday, April 30, 1976, clerk is herein directed to notify Mrs. Baum, Middle Country School District No. 11 and counsel. This constitutes the decision of the court and all motions upon which decision was reserved are resolved accordingly.